# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **PATRICIA GAYLE BOWMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cv-00193** |
| | ) | **Judge Aleta A. Trauger** |
| **TOWN OF ASHLAND CITY,** | ) | |
| **TENNESSEE and GERALD GREER,** | ) | |
| **in his individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Plaintiff Patricia Gayle Bowman asserts claims in her Amended Complaint ("Complaint") under 42 U.S.C. § 1983 against defendants the Town of Ashland City, Tennessee (the "Town") and Ashland City Mayor Gerald Greer (the "Mayor"), in both his individual and official capacities, for deprivation of her rights to due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution and her right to free speech as guaranteed by the First Amendment. She also asserts state law claims for defamation by implication and violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304. (Doc. No. 20.) Now before the court is the defendants' Motion to Dismiss Amended Complaint (Doc. No. 24), supported by a Memorandum of Law (Doc. No. 25) and accompanied by a number of exhibits (Doc. Nos. 24-1 through -7), seeking dismissal of all claims against both defendants under Federal Rule of Civil Procedure 12(b)(6).

In her Response, the plaintiff concedes that she cannot bring a claim against the Mayor individually for violation of the TPPA and agrees to the dismissal of that claim. (*See* Doc. No. 26

at 23 n.4.) Otherwise, she opposes dismissal of her claims. The defendants have filed a Reply in further support of their motion. (Doc. No. 27.)

For the reasons set forth herein, the defendants' motion will be granted.

## I.  STANDARD OF REVIEW

The Federal Rules of Civil Procedure require simply that a plaintiff's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8, that is, "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion to dismiss under Rule 12(b)(6). District courts may grant a Rule 12(b)(6) motion only if a complaint does not state a "plausible" claim upon which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When evaluating the plausibility of a complaint, "courts must accept its factual allegations as true and draw 'all reasonable inferences in' the plaintiff's favor." *VCST Int'l B.V. v. BorgWarner Noblesville, LLC*, 142 F.4th 393, 399 (6th Cir. 2025) (quoting *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020)). District courts must also "restrict their review to the 'four corners' of the complaint and a limited set of other materials, such as documents that the complaint refers to and depends on," as well as public records. *Id.* (citing *Blackwell v. Nocerini*, 123 F.4th 479, 486–87 (6th Cir. 2024)); *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted). *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

## II.    FACTS

Bowman was hired by the Town in September of 2016 as an Accounting Clerk and eventually promoted to the position of Financial Director. (Compl. ¶ 13.) One of her main job duties as Financial Director was to ensure that all laws were properly followed. (*Id.*)

Mayor Greer was elected on August 1, 2024 and took office on August 2, 2024. (*Id.* ¶ 15.) During the week after the Mayor's election, Bowman repeatedly requested to meet with him to discuss the Town's finances, projects, loans, and other items, to clarify "who was responsible for what," and to ensure compliance with requirements related to the segregation of duties; he refused to meet with her. (*Id.* ¶¶ 16–17, 26.)

At a Town Council meeting on August 12, 2024, the Mayor falsely accused Senior Center Director Gena Batts, who was absent from the meeting, of financial misconduct. (*Id.* ¶ 18.) Bowman "spoke up" on behalf of Batts, urging the Council to delay any action until Batts "was present to answer questions." (*Id.* ¶ 19.) Bowman felt it was "a moral issue" to condemn an employee without allowing her to be heard. (*Id.*)

Bowman was on vacation during the week of August 19, 2024. (*Id.* ¶ 20.) While she was out of town, the Mayor and City Attorney Jennifer Noe met with and questioned Batts about the allegations that she had misused Town funds; they then pressured her to resign under the threat of criminal charges. (*Id.* ¶ 20.) Even though "there was no evidence to support" the accusations against her, Batts involuntarily resigned or retired due to the threat of criminal prosecution. (*Id.*)

"As Financial Director for the Town, Bowman is responsible for reporting to auditors any wrongdoing or chance of lawsuit that the Town may face[.]" (*Id.* ¶ 24.) "Fulfilling this duty," Bowman, when she returned from vacation, informed auditors that Batts had been "constructively discharged and therefore forced to resign" over the false accusations, and she provided supporting documentation for her assertion that Batts was innocent of financial wrongdoing. (*Id.*) The auditors

found no malfeasance by Batts. (*Id.* ¶ 25.) Bowman forwarded that finding to the Mayor and Noe. (*Id.*)

On September 6, Bowman learned that Greer had told others that he intended to fire her. (*Id.* ¶ 27.) On September 9, Greer asked her to resign; Bowman refused. (*Id.* ¶ 28.) Greer immediately terminated her for incompetence in front of Noe. (*Id.* ¶ 29.) Noe asked Bowman "to sign a paper stating she was incompetent and insubordinate and . . . had created a segregation of duties issue," but Bowman refused to sign the document. (*Id.*) Noe claimed that Bowman was "dishonest" for refusing to sign the termination paperwork. (*Id.* ¶ 30.) Bowman was escorted from Town property by the Chief of Police. (*Id.* ¶ 40.) The plaintiff believes she was terminated "in retaliation [for] her reporting to auditors that Batts had not done anything illegal." (*Id.* ¶ 43.)

Bow appealed her termination within ten days, "as required by the Town of Ashland City's City Charter as well as Personnel Manual," by submitting a letter to Noe, addressed to the City Council, requesting a meeting with the Council within twenty days. (*Id.* ¶ 39.) Bowman also sent a letter to each Council Member individually, but Noe "refused to set such a meeting with Council." (*Id.*)

Following her termination, the Mayor had Bowman's belongings moved to the police evidence room, giving "[o]ther office employees . . . the belief and false impression that Bowman had done something criminal." (*Id.* ¶ 33.) "The Mayor and employees carried this rumor and stigma out to the public," thus "hinder[ing] Bowman's reputation throughout the community." (*Id.*)

In April 2025, Bowman went to the bank where, after she gave her Social Security number, she was treated as a threat by bank employees and then followed from the building by an undercover policeman. (*Id.* ¶ 36.) The plaintiff believes that these actions took place because "the

Town and Mayor have flagged Bowman's social security number and have implied and presented to others that she has done, and/or will do, something criminal." (*Id.* ¶ 36.)

## III. DISCUSSION

Based on these factual allegations, the Complaint sets forth four "counts." The first Count asserts that the "defendants" violated Bowman's right to due process by terminating her without advance written notice, an opportunity to be respond to the charges prior to her termination, or a hearing after her termination, thus depriving her of constitutionally protected liberty and property interests in her employment.

Second, Bowman asserts that the Mayor committed the tort of "defamation by implication" when he had her personal property removed to the police evidence room "in front of all staff, leading staff to believe that Plaintiff had done something criminal." (*Id.* ¶ 52.)

Third, Bowman asserts that her termination was in retaliation for "refus[ing] to remain silent and report[ing] questionable conduct to the Town's auditors," in violation of her First Amendment rights. (*Id.* ¶ 57.)

Finally, Bowman claims that her termination for "refus[ing] to remain silent and report[ing] questionable conduct of Mayor Greer and City Attorney Noe, and the constructive discharge of [Batts], to the Town's auditors" violated the TPPA.

The defendants seek dismissal of each of these claims.

### A. Due Process Claims

Generally, to prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove that she was deprived of a right "secured by the Constitution or laws of the United States" and that the deprivation was "caused by a person acting under color of state law." *Littler v. Ohio Ass'n of Pub. Sch. Emps.*, 88 F.4th 1176, 1180 (6th Cir. 2023) (citations omitted). There is no dispute here that

the Mayor and the Town acted under color of state law, so the question is "whether the defendants deprived the plaintiff[] of [her] rights." *France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016).

### 1. Procedural Due Process Claim Based on Deprivation of Property Interest

The Complaint alleges that Bowman has a constitutionally protected property interest in her employment created by Tenn. Code Ann. § 6-4-401,[1] and the Town of Ashland City's Charter and Personnel Manual, which both require "notice in writing of all charges, together with an opportunity to respond to the charges." (Compl. ¶ 46.) Bowman asserts that her rights were violated when she was terminated without a pre-termination hearing and that a Council meeting to hear her appeal was not scheduled within thirty days from her termination. (*Id.* ¶ 49.)[2] The defendants argue that the plaintiff's first due process claim must be dismissed against both defendants because she cannot show that she had a protected property interest in her job.[3]

To establish a procedural due process claim under § 1983, the plaintiff must establish three elements: "(1) that [she has] a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, (2) that [she was] deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not

---

[1] The Complaint actually cites Tenn. Code Ann. § 6-4-201. (Compl. ¶ 46.) The plaintiff states in her Response to the Motion to Dismiss that this was a typographical error and that she intended to cite § 6-4-401. (Doc. No. 26 at 5 n.1.)

[2] Confusingly, Bowman also alleges that, "[b]y presiding over the Council meeting regarding Plaintiff's suspension and termination, Defendants denied Plaintiff her right to a meaningful forum for which her termination could be presented and deliberated impartially and instead simply terminated Plaintiff's employment." (Compl. ¶ 50.) In other words, the Complaint is vague about what process Bowman was actually accorded following her termination.

[3] The defendants also assert that the Complaint fails to state a claim against the Town under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that the official-capacity claim (and all official-capacity claims) against the Mayor should be dismissed as redundant of the claims against the Town, and that the Mayor, in his individual capacity, is entitled to qualified immunity. Finding no constitutionally protected property interest, the court does not reach these issues.

afford [her] adequate procedural rights prior to depriving [her] of [her] protected interest." *Houchens v. Beshear*, 850 F. App'x 340, 342 (6th Cir. 2021) (quoting *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)). The first element, the existence of a protected property interest, is a threshold requirement, without which the plaintiff cannot establish the other two elements. *See Guba v. Huron Cnty.*, 695 F. App'x 98, 102 (6th Cir. 2017) ("[T]he presence of a protected liberty or property interest is a necessary element of a procedural-due-process claim." (quoting *Rondigo, L.L.C. v. Casco Twp.*, 330 F. App'x 511, 523 (6th Cir. 2009)).

"Property interests are not created by the Constitution" but, instead, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quoting *Bd. of Regents v. Roth*, 408 U.S., 564, 577 (1972)); *see also Wayne Watson Enters., LLC v. City of Cambridge*, 751 F. App'x 760, 763 (6th Cir. 2018) (*citing Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002)). The court, therefore, must look to Tennessee law to determine whether Bowman had a property interest in continued employment. *Wayne Watson*, 751 F. App'x at 763.

The statute to which the plaintiff refers, Tenn. Code Ann. § 6-4-401, simply requires towns like Ashland City to appoint treasurers. It does not provide employment protection for individuals appointed to those positions.

The Town of Ashland City Personnel Manual ("Manual"), which the plaintiff cites and relies on in the Complaint and, therefore, may be considered by the court without converting the defendants' motion into one for summary judgment, states that a Town Employee "may be dismissed by the Mayor . . . for reasonable cause," which "may include, **BUT SHALL NOT BE LIMITED TO**: misconduct, negligence, incompetence, and insubordination, unauthorized absences, falsifying records, or violating any of the charter provisions, ordinances, or these rules."

(*See* Manual, Doc. No. 24-7 at 69 (emphasis in original).) The Manual also establishes procedures that apply prior to dismissal and appeal procedures:

> Prior to an employee's dismissal, a written statement of the reason for dismissal shall be submitted to the employee. This notice shall also include notification that the employee may appeal to the City Council by filing with the City Clerk/Recorder, within ten (10) days, a written notice of his/her intention to appeal. The City Council shall hold a hearing within twenty (20) days after the notice of appeal is delivered by the employee. The votes of four councilpersons, excluding the Mayor's vote, shall be required to override the dismissal, and the action of the City Council shall be the final determination in the matter. If the dismissal is overruled by the City Council, the employee shall be reinstated to his/her previous position, and any loss of salary shall be paid to the employee.

(*Id.* at 70.)

Despite the mandatory nature of the language pertaining to the appeal procedures, including the use of the word "shall," the Manual also states that it "is not an employment contract" and that "[e]mployment with the City is at-will." (*Id.* at 6; *see also id.* at 68 ("This is not an employment contract."); *id.* at 70 (same); *id.* at 72 (same).) It also specifies repeatedly that the Manual itself is a "statement of current policies, practices, and procedures," which may be "reviewed periodically" and changed "at any time" by the Town, in accordance with the procedures set forth in the Manual. (*Id.* at 6, 48, 68, 70, 72.)

Tennessee courts have recognized that an employee handbook may, as a matter of state law, "become part of an employment contract," but only if it "contain[s] specific language showing the employer's intent to be bound by the handbook's provisions." *Keller v. Casteel*, 602 S.W.3d 351, 360 (Tenn. 2020) (citations omitted).[4] The language used in such a handbook must, to create

---

[4] The Tennessee Supreme Court also stated in *Keller* that it had "not yet 'held that an employee handbook could convert an at-will employment agreement into a protectable property interest' under the due process clause" and "decline[d] to do so in th[at] case." *Keller*, 602 S.W.3d at 362. On this basis alone, the plaintiff's procedural due process claim likely fails under Tennessee law. The court nonetheless presumes, for purposes of the defendants' Motion to Dismiss, that the Tennessee Supreme Court might make that holding if presented with sufficiently compelling facts.

an employment contract, "be phrased in binding terms [and] interpreted in the context of the entire handbook." *Id.* (quoting *Rose v. Tipton Cnty. Pub. Works Dep't*, 953 S.W.2d 690, 692 (Tenn. Ct. App. 1997)). Generally, however, there is "a high standard for establishing the existence of an employer's specific intent to be bound by the terms of an employee handbook." *Id.* (quoting *Brown v. City of Niota*, 214 F.3d 718, 721 (6th Cir. 2000)).

In *Brown*, the Sixth Circuit found that the plaintiffs did not satisfy the Tennessee courts' "high standard for establishing the existence of an employer's specific intent to be bound by the terms of an employee handbook," despite the defendant city's promulgation of a rule stating that city employees "may be terminated for any just cause at the discretion of the board." *Brown*, 214 F.3d at 721, 720. As the court explained:

> The rule concerning employee termination contains the language that the board of commissioners "may" fire a[n] employee for any just cause. The term "may" is permissive and suggests that there are other permissible means for terminating a city employee. In cases where Tennessee courts have found an employment contract to exist, the employee handbook contained the mandatory terms "shall" and "will."

*Id.* at 721 (citations omitted). The court also observed that the rule at issue identified "certain acts as grounds for discharge," but these acts were "characterized as examples of grounds for discharge leading to the inference that they are not the exclusive bases for terminating city employees." *Id.* at 722. On this basis, the court held that the plaintiff could not establish that this language reflected a "clear intent to create a property interest in continued employment with the city." *Id.*

*Brown* is nearly precisely on point with this case, where the Manual states that the Mayor "may" dismiss Town employees for "reasonable cause" and supplies a non-exclusive list of "examples" of reasons. (Doc. No. 27-7 at 70.) As in *Brown*, the term "may" "is permissive and suggests that there are other permissible means for terminating a city employee." *Brown*, 214 F.3d at 721. Moreover, the permissive language regarding termination ("may") must be viewed in the

context of the Manual as a whole, which very specifically—and repeatedly—disclaims an intent to create an employment contract and affirms that employment with the Town is at will. Immediately after the discussion of the appeal process, the Manual reiterates that it is "not an employment contract." (*Id.*) In addition, language in the Manual expressly reserving to the Town the unilateral right to alter or modify the Manual "at any time" further "preclude[s] considering it as a contract." *Claiborne v. Frito-Lay, Inc.*, 718 F. Supp. 1319, 1321 (E.D. Tenn. 1989); *Rose v. Tipton Cnty. Pub. Works Dep't*, 953 S.W.2d 690, 693 (Tenn. Ct. App. 1997) (same, citing *Claiborne*).

The Manual, that is, did not create an employment contract and does not overcome the presumption that the plaintiff was an at-will employee. *See Keller*, 602 S.W.3d at 358 ("In the absence of evidence to the contrary, employees in Tennessee are presumed to be at-will."). As an at-will employee, the plaintiff cannot establish that she had a property interest in continued employment with the Town. *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 766 (6th Cir. 2010) Without a protected property interest, Bowman cannot establish that the Town's failure to comply with its own procedures for termination violated her right to procedural due process. *Accord Keller*, 602 S.W.3d at 362 ([T]he threshold question for [the plaintiff's] procedural due process claim is whether he had a constitutionally protected property interest. Without a protected property interest, he cannot assert a claim for a due process violation."); *see also Edwards v. Shelby Cnty.*, No. 22-cv-02682-TMP, 2024 WL 2964847, at *16 (W.D. Tenn. June 12, 2024) ("[W]here there is no property interest in the job, there is no protected property interest in the procedures which attend the decision to terminate the job." (citations omitted)); *Fitzgerald v. Hickman Cnty. Gov't*, No. M2017-00565-COA-R3-CV, 2018 WL 1634111, at *8 (Tenn. Ct. App. Apr. 4, 2018) ([R]egardless of whether Appellant requested participation in the grievance process during his employment with

Hickman County, that procedure had no effect on Hickman County's ability to terminate Appellant's employment. As such, Appellant simply had no property interest in continued employment that may be vindicated through due process."), *cited with approval in Keller*, 602 S.W.3d at 359 n.11.

The plaintiff's procedural due process claim premised upon the existence of a property interest in her continued employment fails as a matter of law, and the defendants are entitled to dismissal of this claim.

2.    *Procedural Due Process Claim Based on Deprivation of Liberty Interest*

The Complaint asserts that the plaintiff has a "constitutionally protected liberty interest in her employment." (Compl. ¶ 47.) It does not identify any other constitutionally protected liberty interest. The defendants argue that the plaintiff does not have a protected liberty interest in her public employment and, in any event, has not shown that she was deprived of a liberty interest.[5]

As with a property interest, the existence of a protected liberty interest is a threshold requirement without which a procedural due process claim necessarily fails. *Accord Guba*, 695 F. App'x at 102. As the court explained in *Guba*,

> the range of interests protected by procedural due process is not infinite. Fundamental liberty interests protected by the Fourteenth Amendment include those rights that are objectively deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.

*Id.* at 103 (internal quotation marks and citations omitted). Importantly, "a party staking claim to a protected liberty interest must provide 'a "careful description" of the asserted fundamental liberty interest.'" *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). A public employee

---

[5] The defendants also argue, again, that the Mayor is entitled to qualified immunity and that the Complaint fails to state a colorable *Monell* claim against the Town. The court does not reach these arguments.

has no protected liberty interest in her employment when her employment is terminable at will and there is "no public disclosure of the reasons for the petitioner's discharge." *Averitt v. Cloon*, 796 F.2d 195, 200 (6th Cir. 1986) (quoting *Bishop v. Wood*, 426 U.S. 341, 348 (1976)).

The plaintiff, in responding to the Motion to Dismiss, makes no effort to argue that she had a protected liberty interest in her continued employment. Instead, she contends that she had a liberty interest in her "reputation, good name, honor, and integrity . . . protected by the due process clause" and, therefore, that any deprivation of that interest "must be accompanied by notice and an opportunity to be heard to refute" the charges against her. (Doc. No. 26 at 8.)

"[A] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment." *Brown*, 214 F.3d at 722 (quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). A deprivation of those interests "must be accompanied by notice and an opportunity to be heard to refute any charges against that person." *Id.* The Sixth Circuit has identified five elements that must be satisfied to establish that a plaintiff was deprived of a liberty interest entitling her to a name-clearing hearing:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. . . . Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. . . . Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

*Id.* at 722–23 (quoting *Ludwig v. Bd. of Trs.*, 123 F.3d 404, 410 (6th Cir. 1997)). A plaintiff is entitled to a name-clearing hearing only if she establishes each of these elements. *Id.* at 723.

Under the second element, a plaintiff who is discharged for incompetence or even malfeasance generally cannot establish the deprivation of a liberty interest in her reputation or good name. "A moral stigma such as immorality or dishonesty is required to show a deprivation of liberty." *Ludwig*, 123 F.3d at 410. And the statements must be publicized by the defendant. *Id.*

In this case, the plaintiff alleges in a wholly conclusory fashion that the Mayor's *actions* in having her possessions moved to the police station evidence room gave other office employees the impression that she had done something criminal and that the Mayor and other employees "carried this rumor and stigma out to the public," thus "hinder[ing] Bowman's reputation in the community." (Compl. ¶ 33.) These conclusory allegations simply do not suffice to show that the defendants publicized stigmatizing statements about the plaintiff in connection with her termination.

Likewise, insofar as the plaintiff alleges that Noe claimed that Bowman was "dishonest" for not signing her termination paperwork (Compl. ¶ 30), the plaintiff does not allege that this statement was made in public or publicized by Noe or anyone else.

Because the Complaint fails to allege facts that, if true, would show that the plaintiff was deprived of a liberty interest, she cannot show that she was entitled to any "process" in connection with that deprivation. Her procedural due process claim based on the deprivation of a liberty interest in her reputation is subject to dismissal.

### a)   Substantive Due Process Claim

Finally, the defendants argue at length that, insofar as Bowman may be attempting to state a substantive due process claim, the plaintiff fails to allege conscience-shocking conduct by the defendants or otherwise satisfy the pleading requirements for a substantive due process claim. (Doc. No. 25 at 11–14.) It is apparent to the court from reading the Complaint that the plaintiff did not intend to state a substantive due process claim. The Complaint asserts only that the plaintiff's protected property and liberty interests were violated by a deprivation of process in the form of pre- and post-termination hearings. (*See generally* Compl. ¶¶ 46–50.)

The defendant having raised the issue, however, the plaintiff defends such a claim, arguing that, "if the Defendants' conduct is not found to 'shock the conscience,' the facts show that there

was clearly no rational basis for terminating Bowman's employment." (Doc. No. 26 at 13.) She maintains that this all that is required to state a substantive due process claim. (*Id.* (citing *Young v. Twp. of Green Oak*, 471 F.3d 674, 685 (6th Cir. 2006)).) She is incorrect.

"Substantive due process 'bar[s] certain government actions regardless of the fairness of the procedures used to implement them.'" *Guertin v. State*, 912 F.3d 907, 918 (6th Cir. 2019) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). It "specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). The fundamental interests and privileges protected by substantive due process include "the right to bodily integrity," as well as "the right not to be subjected to arbitrary and capricious government action that 'shocks the conscience and violates the decencies of civilized conduct.'" *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)).) The Sixth Circuit has held that, even when public employees have a protected property interest in their employment not to be terminated except for cause, such a right is "not a fundamental interest protected by substantive due process." *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992)).

Bowman does not allege a violation of bodily integrity, and the circumstances under which she was terminated—unfair and unwarranted as her discharge may have been—utterly fail to rise to the level of conscience-shocking.[6] The plaintiff does not argue to the contrary. Instead, she

---

[6] The standard for conscience shocking is high. As the Supreme Court and the Sixth Circuit have explained, "only the most egregious official conduct" can be deemed conscience-shocking. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The solicitation of a bribe by a public official, for example, does not qualify. *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 862 (6th Cir. 2012). Rather, "[s]uch conduct includes actions 'so brutal and offensive that [they do] not comport with traditional ideas of fair play and decency.'" *Range v. Douglas*, 763 F.3d 573, 589-90 (6th Cir. 2014) (quoting *Lewis*, 523 U.S. at 847); *see also Webb v. McCullough*, 828 F.2d 1151,

claims only that the decision to terminate her "had no rational basis." (Doc. No. 26 at 13.) However, her suggestion that every at-will public employee unfairly discharged may bring a claim for a constitutional violation has been expressly rejected by the Sixth Circuit. *See Young*, 471 F.3d at 684 ("[T]he termination of public employment does not constitute a denial of substantive due process." (quoting *Sutton*, 958 F.2d at 1351)).[7]

The Complaint, in short, fails to state a claim for violation of the plaintiff's right to substantive due process. To the extent the plaintiff intended to state such a claim, it will be dismissed.

## B.     Defamation by Implication

Tennessee law countenances claims for both written and spoken defamation. Libel is written defamation; slander is spoken defamation. *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001). Under Tennessee law, to state a *prima facie* case for defamation, the plaintiff must allege facts that, if true, establish that the defendants "damaged [the plaintiff's] reputation by knowingly or recklessly publishing a statement that conveyed a false, defamatory fact about [her]." *SmileDirectClub, Inc. v. NBCUniversal Media, LLC*, 708 S.W.3d 556, 573 (citation omitted). For an ordinary defamation claim, only false statements are actionable, and truth

---

1158 (6th Cir. 1987) (describing conscience shocking conduct as that which was "inspired by malice or sadism" or represented a "brutal and inhumane abuse of official power" (quotation marks and citations omitted)). The plaintiff here does not contend that the defendants' conduct shocks the conscience.

[7] After finding that the plaintiff did not have a viable substantive due process claim based on his termination from public employment, the court in *Young* also stated that, "[t]o the extent that a substantive due process claim is available, Young must demonstrate that the Township's decision to terminate his employment had no rational basis." *Young*, 471 F.3d at 685. This statement was clearly dictum. Moreover, it cannot be understood to mean that the termination of a public employee—either an at-will employee or one who has a protected property interest in her employment—could ever implicate substantive due process, absent a showing of some conscience-shocking conduct on the part of the defendants.

is a nearly universal defense. *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001) (citations omitted).

Defamation by implication is simply "another mechanism by which plaintiffs may prove defamation." *Grant v. Com. Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *9 (Tenn. Ct. App. Sept. 18, 2015), *abrogated on other grounds by Funk v. Scripps Media, Inc.*, 570 S.W.3d 205 (Tenn. 2019). Defamation by implication occurs when statements that are technically true "imply facts that are not true." *Id.* (citation omitted). Thus, to plausibly state a claim for defamation by implication, the plaintiff must allege that the defendants "published . . . statements and that the meaning reasonably conveyed by the statements was defamatory." *Loftis v. Rayburn*, No. M2017-01502-COA-R-3CV, 2018 WL 1895842, at *5 (Tenn. Ct. App. Apr. 20, 2018) (citing *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978)). "[I]f the statements at issue are true but they imply facts that are not true, a defendant who made the statements may be liable for defamation by implication or innuendo." *Id.* (citing *Grant*, 2015 WL 5772524, at *12).

To state a *prima facie* case for defamation by implication based on slander (spoken words), "the substance of the slanderous utterance [must be] pled along with notice of the time and place of the utterance." *Handley v. May*, 588 S.W.2d 772, 775 (Tenn. Ct. App. 1979); *see also Blythe v. Forsythe*, No. M2023-01463-COA-R3-CV, 2025 WL 3095415, at *9 (Tenn. Ct. App. Nov. 6, 2025). *Words* are required; slander may not be "perpetrated by an act or deed." *J. M. James Co. v. Cont'l Nat. Bank*, 58 S.W. 261, 263 (Tenn. 1900) (noting that the statute of limitations for slander required that "[a]ctions for slanderous *words spoken* shall be commenced within six months after the *words spoken*" (emphasis added) (citing Shannon's Code, § 4468)). The current statute confirms as much; it provides for a six-month limitations period for "[a]ctions for slanderous words *spoken*," running from the date the "words are *uttered*." Tenn. Code Ann. § 28-3-103

(emphasis added); *accord Pera v. Kroger Co.*, 674 S.W.2d 715, 720 (Tenn. 1984) ("Without evidence as to some specific publication of libelous or slanderous material, and the content of that material, there is no predicate in the record for any separate award against Kroger for libel or slander.").

The Complaint asserts that the Mayor "committed the tort of defamation by implication . . . by, among other things, taking Plaintiff's items to the police evidence room in front of all staff, leading staff to believe that Plaintiff had done something criminal." (Compl. ¶ 52.) The defendants move for dismissal of this claim based on the plaintiff's failure to allege the *publication* of any *statement* by the Mayor (or anyone else) that could have had a defamatory meaning. (*See* Doc. No. 25 at 20–22.) In her Response, the plaintiff does not dispute the proposition that defamation by implication may not be based on "nonverbal physical actions," but she asserts that "[m]ore than nonverbal physical actions have been alleged." (Doc. No. 26 at 18.) Apparently abandoning her claim that the Mayor's act of moving her personal possessions was defamatory, which is the only action specifically identified as defamatory in her Complaint, Bowman points to her allegations that she saw the Mayor and other employees "laughing and whispering on September 6, 2024, about her termination" and asserts that she is "entitled to the discovery process to unearth direct quotations." (*Id.*) The plaintiff, however, is not entitled to discovery to unearth facts that might support her defamation claim. *See Hall v. U.S. Bank, N.A.*, 626 F. App'x 114, 116 (6th Cir. 2015) (recognizing as "well settled principle" that "a plaintiff who fails to state a claim is not entitled to further discovery" (citing *Mitchell v. McNeil*, 487 F.3d 374, 379 (6th Cir. 2007)).[8]

---

[8] The court notes that a recent joint filing by the parties reveals that extensive discovery has taken place since the filing of the Motion to Dismiss in June 2025. (*See* Doc. No. 28.) Despite that, the plaintiff has not attempted to further amend her allegations.

Bowman also claims that she was defamed when the Mayor called her "incompetent" in front of Noe and the Town's HR personnel, when the Mayor and Noe asked her to "sign a paper stating she was 'incompetent and insubordinate' and had "created a segregation of duties issue," and when Noe called her "dishonest" for not signing the termination documents. (*Id.* at 18–19.) However, as Bowman herself acknowledges, communications among the Mayor, the Town Attorney, and the Town's HR department in connection with the plaintiff's termination do not constitute publication, for purposes of a defamation claim. *See, e.g.*, *Certain v. Goodwin*, No. M2016-00889-COA-R3-CV, 2017 WL 5515863, at *7 (Tenn. Ct. App. Nov. 17, 2017) ("[C]ommunication among agents of the same corporation made within the scope and course of their employment relative to duties performed for that corporation are not to be considered as statements communicated or publicized to third persons [for purposes of a defamation claim]." (quoting *Woods v. Helmi*, 758 S.W.2d 219, 223 (Tenn. Ct. App. 1988))).

Finally, Bowman points to the actions by bank employees in April 2025, responding to her as if she were a threat, as evidence that her reputation has been destroyed. (*See* Doc. No. 26 at 20.) She infers from the bank employees' conduct that "statements must have been made about [her] in connection with potential criminal or fraudulent activities." (*Id.*) She does not identify the statements or who made them, however, and it is apparent that the plaintiff's belief is based on nothing more than speculation. Even if the court accepts the allegations regarding the incident at the bank as evidence of damages to the plaintiff's reputation, Bowman still must establish the publication of written or spoken *statements* that damaged her reputation to state a claim for defamation.

The plaintiff, in short, has simply not alleged facts showing that the defendants *published* to third parties any *statements*, written or spoken, that might have been defaming or construed to

have a defamatory meaning. The Complaint fails to state a colorable claim for defamation or defamation by implication.

### C. First Amendment Retaliation

"Public employees' statements made 'pursuant to their official duties,' rather than in their capacities as private citizens, are not protected by the First Amendment and therefore are subject to "employer discipline." *Barton v. Neeley*, 114 F.4th 581, 588 (6th Cir. 2024) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). However, while public employees' First Amendment rights are "narrower than those of 'the citizenry at large," such employees do not completely "surrender their First Amendment rights by accepting public employment." *Id.* Rather, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* (quoting *Garcetti*, 547 U.S. at 417). More specifically, a public employee's speech is constitutionally protected if: (1) she speaks "as a private citizen rather than pursuant to [her] official duties"; (2) her speech "involve[s] a matter of public concern"; and (3) her speech interest "outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017)); *see also Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012). All three of these elements must be met for a public employee to assert a valid First Amendment retaliation claim. *Evans-Marshall v. Bd. of Educ.* 624 F.3d 332, 338 (6th Cir. 2010).

In this case, the plaintiff specifically alleges that, as the Town's Financial Director, she had a duty to "ensure that all laws were properly followed" and to "investigate and report any potential criminal conduct that could expose the Town to risks." (Compl. ¶ 57.) She also specifically alleges that, as Financial Director, she was "responsible for reporting to auditors any wrongdoing or chance of lawsuit that the town may face." (*Id.* ¶ 24.) "Fulfilling her duties," Bowman reported to

the auditors that Batts had been constructively discharged and forced to resign or retire based on false accusations against her. (*Id.*) Bowman also forwarded proof of Batts' innocence to the auditors. (*Id.*) Bowman adds that she "personally felt that it was morally wrong to accuse someone of suspicious activity that they did not actually commit." (*Id.*) After the auditors confirmed via email that Batts had not committed malfeasance, Bowman forwarded this information to the Mayor and Noe "for record keeping purposes." (*Id.* ¶ 25.) Bowman asserts that she was terminated in retaliation for having reported to the Town's auditors, in accordance with that duty, her belief that Batts had been falsely accused of financial misfeasance and constructively discharged by the Mayor and Noe. (*Id.* ¶ 57; *see also id.* ¶ 24.)

The defendants argue that the Complaint makes it clear that the speech at issue was made pursuant to the plaintiff's official duties. (Doc. No. 25 at 15.) In her Response, the plaintiff makes no attempt to argue that her speech to the auditors was *not* made pursuant to her official duties. Instead, she argues that, when she spoke at the Town Council meeting on August 12, 2024, urging the Council to postpone consideration of the allegations against Batts until she was there to defend herself, she spoke at least in part as a citizen "on a matter of public concern." (Doc. No. 26 at 14–15; *see also* Compl. ¶ 19.)

The plaintiff, however, nowhere alleges in the Complaint that she was terminated in retaliation for speaking up at the Town Council meeting or, indeed, that there was any causal connection between her speaking at the Council meeting and her termination. Rather, she alleges that she was terminated for reporting her concerns about Batts' termination to the auditors. (Compl. ¶ 57.) The fact that she may have spoken as a citizen during a Town Council meeting, therefore, does not salvage her First Amendment retaliation claim.

The court finds that the Complaint fails to state a colorable claim for First Amendment retaliation.

### D.  TPPA Retaliatory Discharge

The TPPA provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). The statute creates a private right of action for any employee who is terminated in violation of that provision. *Id.* § 50-1-304(c)(1). In any civil case asserting a claim under this section, the plaintiff has "the burden of establishing a *prima facie* case of retaliatory discharge . . . at all stages of the proceedings." *Id.* § 50-1-304(f).

A *prima facie* case of retaliatory discharge under the TPPA contains four elements:

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about illegal activity;

(3) the defendant employer discharged or terminated the plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015).

The TPPA defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety, or welfare." Tenn. Code Ann. § 50-1-304(a)(3)(A). "[U]nder the TPPA, illegal activity requires violation of a state or federal statute or regulation." *Davis v. Vanderbilt Univ. Med. Ctr.*, No. M2019-01860-COA-R3-CV, 2020 WL 4516094, at *3 (Tenn. Ct. App. Aug. 5, 2020). Tennessee courts have dismissed claims under the TPPA for failure to state a claim where the complaint does not identify the "specific statutory or regulatory provision that [the plaintiff] believed had been violated or would be violated." *Konvalinka v. Fuller*, No. E2017-00493-COA-

R3-CV, 2019 WL 2323831, at *8 (Tenn. Ct. App. May 31, 2019) (affirming dismissal of TPPA claim where the plaintiff failed to "identify a specific statutory or regulatory provision that was implicated by his employer's conduct) (citing *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 788–89 (Tenn. 2010) (discussing identification requirement in the context of a common law retaliatory discharge claim);[9] *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997) (concluding that the plaintiff's identification of specific fire code violations was sufficient to show "illegal activity" for purposes of the TPPA)).

However, identifying a specific statute or regulation implicated by the defendant's conduct is a necessary but not sufficient basis for a TPPA claim. "Persons asserting either a statutory or common-law whistleblowing claim must prove more than that their employer violated a law or regulation. They must prove that their efforts to bring to light an illegal or unsafe practice furthered an important public policy interest, rather than simply their personal interest." *Collins v. AmSouth Bank*, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007) (internal citations omitted), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010)

The defendants argue that the plaintiff's TPPA claim is subject to dismissal because she fails to identify with specificity a statute or regulation that was implicated by the defendants' conduct. (Doc. No. 25 at 28.) They argue that the plaintiff reported a "constructive discharge" but that constructive discharge is not *per se* illegal under any statute or regulation. (*Id.*) They point out that Bowman also has not alleged that Batts' termination arose from illegal discrimination based

---

[9] The TPPA was enacted in 1990 and "essentially codified the common-law cause of action for retaliatory discharge," except that the statute, unlike the common law, (1) requires proof that the protected conduct was the *sole* reason for the employee's termination and (2) extends protection to public employees. *Williams*, 465 S.W.3d at 109–10. The TPPA was amended in July 2014 to specifically "'abrogate[] and supersede[] the common law with respect to any claim that could have been brought under this section.'" *Id.* at 110 (quoting Tenn. Code Ann. § 50-1-304(g) (2014)).

on a protected characteristic under federal employment law and argue that, even if she had, violation of federal employment discrimination law is excluded from the TPPA's definition of "illegal activity." *See* Tenn. Code Ann. § 50-4-304(a)(3). The defendants also maintain that the plaintiffs cannot show that an important public policy interest was implicated by the defendants' decision to terminate an employee who had been accused, even incorrectly, of financial misfeasance. (*Id.* at 30.)

In her Response, the plaintiff does not contend that constructive discharge qualifies as illegal activity for purposes of the TPPA. Instead, she asserts that "extortion is both a common law and statutory offense." (Doc. No. 26 at 22.) She claims that the Mayor and Noe committed common law extortion when they questioned Batts and pressured her to resign and did not allow her to make a statement refuting the financial misconduct accusations against her. (*Id.*) The defendants' Reply argues that this theory is not articulated in the Complaint and that, even if it were, the facts as alleged do not remotely establish the elements of a common law or statutory extortion claim.

The court agrees that the plaintiff is grasping at straws. A Tennessee statute defines the crime of extortion as requiring proof that a person used, as relevant here, "coercion upon another person with the intent to . . . [o]btain property, services, any advantage or immunity [or] [r]estrict unlawfully another's freedom of action." Tenn. Code Ann. § 39-14-112(a)(1)–(2). "At common law, extortion was the taking, by color of office, of money or other thing of value that was not due." *State v. Hilton*, No. 278, 1991 WL 168608, at *3 (Tenn. Crim. App. Sept. 4, 1991) (citing *State v. Cooper*, 113 S.W. 1048 (Tenn. 1908)). Aside from the fact that the Complaint does not identify the crime or regulation the plaintiff believes was implicated by Batts' termination, the Complaint also does not allege facts suggesting that the Mayor and Noe pressured Batts to resign with the intent to obtain money, services, or immunity or to restrict Batts' "freedom of action."

The defendants are entitled to dismissal of the TPPA claim for failure to state a claim for which relief may be granted.

**IV.     CONCLUSION**

As set forth herein, the defendants' Motion to Dismiss (Doc. No. 24) will be granted, and this case will be dismissed in its entirety. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge